Please be seated. Clerk, call the next case, please. 3-14-0388, estate of Emily Dukovac in Chelseyham, Appalachia, by Brent Ames v. Sinson Law Group, appellant by Kent Sinson. Mr. Sinson. Good afternoon. Good afternoon. My name is Kent Sinson with the Sinson Law Group. And as you know, well, first of all, I want to say this. I just want to thank you for granting me oral argument in this case. I've been so frustrated in first district cases that I can never get an oral argument. And just watching the process here, I see how much I think it helps the lawyers. I think it helps you help decide this case. And I think that it's a really good thing that we have a chance to talk to each other a little bit. I think justice is served by it. You know, the facts of this case are not that complicated. I highly encourage you all to read the transcript. I was there for that where I said to Judge Powers, please, please give me a hearing on this issue of whether or not this should be a contract fee or whether or not this should be a front demerit. And what I said to him is that under Delapaz and under Rhodes, there are clearly cases, Rhodes from the Supreme Court and Delapaz from the first district, that say that if one lawyer has done the bulk of the work and then it gets transferred to a new law firm and they quickly settle the case, that the first set of lawyers can get the contract fee and then the new lawyers get only paid on a front demerit basis. All I wanted was my chance to make that argument with all the facts. And all I needed to do that was, one, I could talk to the court myself and testify. In fact, I brought a lawyer with me to court to call me as a witness, to explain to the court all the work I had done, how I ended up with several bankers' boxes worth of files in this case. Well, you got to show him all the work you did, didn't you? Well, what I did show him was I gave him timesheets eventually, but I never got to testify. During my opening statement, he cut me off and he said, I've already decided that we're going to decide this by quantum merit, and the only way I'm going to decide quantum merit is by timesheets. So to me, there's a two-step process here. First is, is this a contract fee case where I get paid on contract fee and the other side gets paid quantum merit, or vice versa? And the only way to know the answer to that question is to compare what work I did, which I know, okay, to what work they did, which I don't know, because I wasn't involved in the case at that point. So what I did was I sent a production request to them for their file, and I subpoenaed them to court because I wanted to call them as an adverse witness. And the opening statement, Judge Powers basically said, you know what, you can't even finish your opening statement. You can't call them as a witness. You can't have discovery as to their file, and I'm going to shut you down as to learning what information or all the information that's out there about how much work they did. So now I'm in a situation of not only will he not let me testify, and not only will he, and I brought my whole file, all my bankers' boxes. Not only will he not let me testify, not only will he not let me bring my files and show them to him and talk to him about it, and I was not going to be wasteful of his time, but I felt really clear that it seemed that the intuitive facts that I got was I had done a ton of work on this case, and there was no evidence that they hired any experts. There was no evidence they took any depositions. There was no evidence they did any written discovery. There was no evidence they did anything on the case. And I just wanted to have a chance to look at their file and say, well, let's look at what they did compared to what I did. And he wouldn't let me do that. And then he basically kind of poked me and he said, well, you know, if you disagree with me, Counsel, that's what the appellate court is for. So you guys got mentioned even down there. And here you are. And here I am. Let me ask you this. Now, when you were discharged, you didn't have an offer. I'm sorry, the young lady, the survivor, the injured young lady. Right. Chelsea Hamm, basically what happened was I got retained by the Duke family very early in the case. And for whatever reason, Chelsea Hamm did not want to hire me at that point because Elena Heyman was still in there. And Elena Heyman was, she was the girl that was driving the car that my client was in when it happened, who turned out to be uninsured. And for whatever reason, Chelsea Hamm did not want any part of suing Elena Heyman. But once Elena Heyman declared bankruptcy, and despite the fact that I had no judgment, the bankruptcy discharged her in bankruptcy court, which I fought, but unsuccessfully fought. At that point then, Elena Heyman called me up on the phone and said, remember I didn't want to be involved? Well, now I do because Elena Heyman is no longer a defendant. This is just about the truck driver, Frederick Warner. So I got involved at that point. And then I got a phone call from the defense lawyer saying, you know, listen, we'll offer the estate $25,000. I've got room to move on this thing. If you think we're in the ballpark, you know, just let me know. I frankly thought I'd have a chance to get maybe up to $100,000. But at that point, you know, after I met with my clients, they discharged me. This was, now the offer came from the trucking company, I presume? It did. Okay. And I presume, because this is, I used to defend these cases. You would know that it had to be the Elena Heyman's accident. How do you get a dead 17-year-old and settle a case for $25,000, $50,000? Right. That would be a pretty, yeah, they would be very happy to do that. Yeah, I mean the trucking company had $3 million worth of coverage. Right. So, and this was a 17-year-old girl that after she passed away, the Facebook post I think totaled 5,000, the support from the community because of the tragedy here. But you had apparently no liability on the trucking company. Well, you know, it was a tough case. But there was a lot of coverage, and there was a super innocent victim. Okay. And if, you know, if Elena Heyman would have had a $3 million policy, obviously this could have been really different because the liability was real strong on her. But what I was trying to argue was, is that there was some kind of comparative fault by the trucker, that he was either speeding or that he was not showing due care. I hired a lot of experts to go out and process the scene and pull his truck apart to do, I pulled the event data recorders out of his truck to make sure that what kind of digital information I could get from him. I mean, really, really, I did a lot of work on this case. And frankly, I spent, and so did the trucking company. I mean, they hired their own expert, and their insurance company went all out. I mean, everybody knew this was a case where you just don't sit back and be casual about this. But in fairness, I mean, you also got a $33,000 fee by making a phone call to the insurance company, right? They ponied up their uninsured motive. Yeah, here's what I'd say about that. First of all, that's only because Elena Heyman declared bankruptcy. So, you know, I mean, the reality of it is, and I will say this, I've gotten a verdict four times this year. Two of them have been not guilties. And guess what? I lost a lot of money on those cases. And sometimes I make some good money, and I don't have to work so hard. And sometimes I work really hard, and I really, you know, bust my butt for my client, and I can't even, I lose money. So, you know, I just consider you've got to do what's right for the case. That's how I practice law. And sometimes that's, you know, not so much work, and sometimes it's a lot of work. You know, I don't think Judge Powers, when he basically denied me this hearing, didn't consider the uninsured coverage as being a factor in his calculus. I mean, he basically said, as a matter of law, even though I know nothing, I'm not going to allow you to make a contract argument. And I asked him, well, you know, if you know no facts, how can you reach that conclusion? And, you know, he said, well, I don't have all day to argue with the counsel. And it's right in the transcript. I mean, it's, you know, he basically just pushed me off. And as I said, you can't reach that conclusion if you don't give me the information to present to you by ordering them to either testify or give me their file, or allow me to testify and present that evidence to you. And frankly, if I had all that and I would have been able to go into court and present my case and he would have ruled against me, I'm good. You know, I got my day in court. I mean, that's what we hire, that's why we elect judges, to decide things like that. And he, for whatever reason, didn't want to do it. He told me to go off into the conference room with a defense lawyer and meet and work this out. We go in there. I said, okay, so how much work did you guys do on this case? They said, we're not going to tell you. I go, well, how can I work this out if I still don't know all the facts? So we went back out. We told the judge we still couldn't resolve things. And that seemed to make him upset that we couldn't resolve things. And so, you know, I mean, I'm not here because I'm making any money on this case anymore. I mean, I've already spent more time writing briefs and stuff than I'll ever get back. But I just think that how he treated me and my law firm was really wrong here. I mean, we deserved our day in court. Win, lose, or draw, we deserved our day in court. And, you know, the cases that talk about you might get the contract when there's attorneys fired and then almost immediately after, you know, the case is settled. Where in this case, it looks like, just looking at the numbers, it was, I think, seven months or so later. I'll wait until I'm finished. Yeah. And seven months or so later, and then double the offer on the estate and $25,000. Not on the table for the other person. So you had $25,000 when they settled. They had a total of $75,000. All right. So let me address both. Statistically or percentage-wise, that's a significant difference. Let me address both of those because I know they've made those arguments, and I strongly disagree with them. First of all, when there's a $3 million policy and there's a vet 17-year-old, okay, when you take an offer and you take it from $25,000 to $50,000, I don't think that's a substantial increase. It's certainly a double of the original number. But the reality is, as you pointed out earlier in your argument, any defense lawyer in his wildest dreams would be happy to settle a case where their client's accused of killing a 17-year-old for $50,000. I mean, everybody knows that damages way exceed that. So the fact that it was double what the offer was, I don't think really is indicative much. Secondly, the defense lawyer told me he had more room, a lot more room, if he felt we were close. And what I took that to be, what I told my clients was, if you want, I think I might be able to get around $100,000 for you. If you want me to approach them on that, I will. But I said, in my estimation, this case is worth more and it deserves more, and we need to take depositions and find out if we can establish some more facts as to the truck driver's negligence. Because there's just too much exposure here, potentially, on the other side, that we just will never know about. And you know what? The defense lawyers or the plaintiffs' lawyers that took this case over, they had a different view of it. They went and settled the case. And you know what? Maybe in the long run, I would have too. I can't second-guess that decision. But what I can't second-guess is it's not how I would have handled it, and it's not how I'd recommend that my clients handle it. When you've got a dead 17-year-old, you need to take depths, in my opinion. Now, the other point that you pointed out was not just the money amount and how it shifted, but the time frame between when they took the case over and when it settled. And part of the record is the court orders from that time. And there's like four of them. And two of them, the plaintiffs' lawyers that took over for me didn't even appear. And in one of them, Judge Powers orders them to appear on the next date because he's mad that they haven't been there. So basically, you've got four or five status dates in that time period where there's no motions decided, no orders regarding discovery, no orders regarding settlement, no orders regarding anything. And so, I mean, if that means that they did some substantial work during that time, it's possible. But again, that's why I wanted to file. I wanted to see. That's why I sent the production request over to them because I wanted to know the answer to this. I would have been happy to sit down with Whiteside and Goldberg and say, can we work this out, but I'm not going to do it when you won't tell me what work you did and you won't show me evidence of what you did on the case. And their attitude always to me was, we don't owe you that. We're not going to tell you. And Delapaz and Rhodes both say that if you're going to decide this question of a contract fee, you have to look at the relative work that the two sides did. And I can't answer the question about what work they did or didn't do without their file. And so that's why I brought this. And so those are some of the concerns that I had. Now, so you've got the file issue. I framed it as a due process thing. I mean, I get the fact that the trial courts are busy. But the other part of this is, you know, we need judges that will, you know, give people their time to do what they need to do to represent their clients. And why Judge Power was so hostile to my situation and my cause, I have no idea. I deserve, my law firm deserved to stay in court. It deserved to know what evidence was out there that supported my arguments or was against it. And we deserved to, you know, find out what was going on. Counselors, two minutes. And then I just say this too. The last thing that he did was he said that when he got to Point of Maryland, and, again, it's interesting because he never asked them to produce time sheets. So, again, I have no idea what they did. Well, they're Point of Maryland. Their time sheets are irrelevant. Yeah, they probably are. They were not on more than a contract fee, but they're irrelevant. And he even conceded to me, he goes, I get the fact that you're a plaintiff's lawyer and that as a plaintiff's lawyer you don't have time sheets and you're going to have to go back and recreate things. And I'm sure there was a ton of work I did on the case that I didn't put down because I couldn't figure out exactly what work I did. I just had, I mean, you make a phone call to an expert. If you don't write it down right away, you forgot that you made the phone call. I mean, you know you hired the expert, but, you know, there's a limitation on how much you can create that way. And then he came up with, you know, I've been awarded by various judges $400 an hour, for a guy with 25 years of legal experience prosecuting wrongful death cases, saying that anybody with 25 years experience in Will County that could prosecute a wrongful death case for $200 an hour would be happy to get that. And, I mean, he's certainly got more connection to Will County than I do. I mean, he's out there every day. I'm not. But the reality of it. The defense lawyer wasn't making that. And I think you look, in the law, you look at the market. I don't know what Jeff Pavlich was making. I know he's a really good lawyer with Lee Hay and Pavlich, whatever the firm is. But, you know, I would say even in Chicago, it's pretty unusual for somebody to only be making $200 an hour. I mean, when you consider all the overhead out there. Well, see, Chicago is, in some respect, a million miles away from Joliet. It is, yeah. But, I mean, I guess this. Judge Darrow used to be in DuPage County, as you know, and he awarded me $375 an hour when he got to federal court for a case I tried there. I'm the same lawyer when I tried that case as when, you know, from where he came. So, you know, I mean, the reality of it is there's a market value out there. And, you know, I've spent 15 years as a plaintiff's lawyer. I've spent 12 years as a prosecutor at Cook County State's Attorney. So I've had some experience. I haven't been, you know, hiding from the practice of law. I've been out there actively doing what I can to help my clients and help the people. And I just felt that $200 was not an adequate compensation for my time. Thank you. When were you discharged? I'm sorry? Why were you discharged? Well, I don't know the answer to that. I mean, the way it happened was I got a letter, as I typically do in the rare times I am discharged, in the fax machine signed by my client saying, you're discharged. There was no phone call. There was no, we want to talk to you. You know, why they contacted Whiteside and Goldberg after I suggested that we take these depositions and do all this work to see whether we could create more liability on a $3 million policy with that 17-year-old, I don't know the answer to that. I was not privy to that. Frankly, you know, it's not for me to judge. So I don't know the answer to that question. All I know is what I got, which was a fax that said, you're discharged. And interestingly, you know, the Dukovics, Pam and her husband, both, you know, the faxes came together. But even Elena Hayman's, I'm sorry, not Elena Hayman's, Chelsea Hamm's letter saying that you're discharged came at the same time through the same fax. So there was some coordination on the other side. This wasn't like I just got discharged by the Dukovics. I mean, for whatever reason, Chelsea Hamm's discharging me too at the exact same time and they're indicating they're going to the exact same firm. And, you know, I was fine. I sent them over my file, you know, and I said, I hope you win this case. This is a terrible tragedy. There is nothing that can speak greater about this. I mean, they were going to a sub sandwich shop because one of the guys that was working there, one of the girls in the car had a crush on her. That's what happened. And, you know, I saw the car afterwards. The seat my client was in when it happened didn't exist after the impact from the truck. That's how bad the impact was. Okay. So, anyhow. Thank you. Sure. Thanks. Mr. Eames, good afternoon. Good afternoon, Your Honor. May it please the Court. Good afternoon. Good afternoon, Mr. Simpson. My name is Brent Eames. I'm here on behalf of the third-party plaintiffs, the estate of Emily DeKovac and Chelsea Hamm, asking this Court to affirm the decisions of the trial court, which found that the lien holder was not entitled to an evidentiary hearing as to whether he was entitled to recover the entire contract contingency fee that he had signed with the plaintiffs, that no written discovery was warranted for that situation, and lastly, that he be awarded attorney's fees totaling $10,540, representing 52.7 hours of $200 an hour. The most important point off the bat, and Mr. Simpson just indicated, he referred to this as a matter of law. And so that's really the question here today. The plaintiffs take the position that this is actually within the discretion of the trial court and the standard is an abuse of discretion. In his briefing here today, he calls it, as a matter of law, I am entitled to this evidentiary hearing, but in his briefs in here today, he's produced absolutely no case law in support of his position that he's entitled to this as a matter of law. Additionally, he frames it as a due process issue. Although plaintiffs take the view that this is a discretionary issue with an abuse of discretion standard, we will address those issues very briefly. Now, regarding the due process clause, there's nothing in the due process clause that indicates that as a matter of law and constitutional prowess, anybody that wants an evidentiary hearing on any issue, no matter irrelevant or not, is entitled to that evidentiary hearing. Far from it. The only thing that you're entitled to by due process is notice and an opportunity to be heard and defended in an oral proceeding. Mr. Simpson appeared in court four different times regarding attorney's fees alone, starting on August 1, 2013, all the way through April 21, 2014. Numerous times against his argument, I believe that I'm entitled to a contract recovery based in part on the DelPaz case. And each and every time, Judge Powers, in his discretion, dismissed that argument and held over and over again that this fact in these cases did not present any unique facts to stray from the normal rule that as a rule, a discharge attorney is only entitled to quantum merit. What did he have available in the records from at that time to determine that there wasn't any uniqueness to this? The records would be anything from a normal wrongful death case, which was filed including all the pleadings, all of the discovery, all of the case management orders. The law says that the trial judge is in the best position to make determinations concerning attorney's fees because they are in the best position to not only understand the work that goes into that type of case, this being a wrongful death case, but the work that went into that particular case. And he himself was in the best position because he actually witnessed the work that was performed by the discharged law firm and the successive law firm. He is given broad discretion by law to make these decisions concerning attorney's fees. And in his discretion, he determined it's irrelevant, whatever work the successive law firm did. This evidentiary hearing that you want is irrelevant. The written discovery would be irrelevant because this, by law, is a case where you are only entitled to quantum merit. I do not see anything in the facts that I know that indicates we should stray from that law. So Judge Powers had your records so that he could see what you had done? Judge Powers had everything that was in the court file. That would include anything that was filed by the firm. Yes, Your Honor. You didn't file your timesheets? That's correct. We never filed timesheets or anything along those lines because it was determined to be irrelevant because this whole question would be the work performed by the discharged law firm. Now, given the fact... It's the bulk of the work. In order for them to be successful in paying for the contract fees, And that's what I'm asking is how would Judge Powers know who did the bulk of the work without something... It seems like the docket entries after your firm took over were pretty scant. I believe that the De La Paz case indicates that the standard is called much work. If much work is performed by a prior law firm, the case settles immediately thereafter. So it's not a bright line rule in that regard. It doesn't say that mandatorily the contingency fee contract from the discharged attorney should be warded. It's left to the discretion of the court. In the judge's discretion, and of course I can't speak for the judge, having presided over the case from the outset, and of course similar cases like it, watching the attorneys perform the work, seeing what was done, he determined that this case did not qualify as an exception to that general rule, that as a discharged attorney, Mr. Simpson's law firm would only be entitled to quantum merit. And our standard is abuse of discretion? And that's to the point. This isn't a question of law. The standard should be an abuse of discretion because the appellant lien holder has provided no law in support of his contention that as a matter of law he's entitled to this hearing. How can we review his exercise of discretion if he didn't have everything and consequently we don't have everything because it's not in the record? The judge is entitled to broad discretion in having presided over the case. Now the reason that the judge is entitled to this broad discretion in these decisions is precisely what Mr. Simpson was describing that he was attempting to do with this case, which was subpoena four different people to testify regarding the work that not only he performed on this case, but the work that the successive law attorney, Jason Whiteside, performed, as well as subpoenaing the defense attorney on this case and the insurance company, presumably to elicit testimony concerning different conversations that were had at different times, concerning offers that may or may not have been made and authority he may or may not have had at the time of those offers. Also of note that Mr. Simpson sent a subpoena to the law partner of Jason Whiteside, Michael Goldberg, who by all accounts didn't have anything to do with this particular case but was expected to show up to court and provide testimony concerning it. This is the type of delays and ridiculousness which we want to give Judge Powers the discretion to be able to avoid. He indicated, I'm not going to sit here and write line by line on a notepaper and add up all the work that you were going to testify that you did on this case. I want you to submit to me your timesheets and indicate what you're claiming that you did on this case and then I'll make a ruling. In the court's discretion, it made that decision, trying to save itself time and save the circus that it would entail. Is it an exercise of the court's discretion to determine whether it's contract, basis, or quantum error? Yes. In the court's discretion, Judge Powers. Okay, so don't we need to know what he did or what he had or what he considered in exercising that discretion? In the record, Judge Powers indicated several times in making his rulings that having reviewed and seen the attorneys in action, seeing the settlement offer and what it ultimately settled for, he indicated that the successful law firm, Jason Whiteside and Goldberg, deserved credit for getting the case resolved. That's another important point here is that after being fired, it can't be lost in this that it was a very tragic event. Mr. Simpson indicated liability was difficult, but the firm was successful in getting the case resolved via settlement. Happy clients. At the end of the day, this is about the clients and what the clients want. Clearly, there was something that happened in Mr. Simpson's law firm that produced an unhappy client and ultimately resulted in the case settling with the successive attorneys to get it resolved to their satisfaction. So that's an important point to note as well. Given the abuse of discretion standard, it's important to note another point regarding the hourly rate, which was awarded to Mr. Simpson, that according to John's case cited in the plaintiff's brief, the court is not limited to the evidence presented before it, including the affidavits regarding what federal courts have awarded Mr. Simpson's law firm in the past. Rather, the courts are allowed and encouraged to use their own experiences in determining what is a proper attorney's fee. Judge Powers indicated that in his experience sitting in Will County, a lot of attorneys are worth less than $200 an hour. He specifically noted in making his finding Mr. Simpson's 25 years of experience and said that his appropriate fee would be $200 an hour in making this ruling. That being the case, it cannot be said that he abused his discretion in finding that Mr. Simpson was worth $10,540 to the case. It was obviously an informed decision based upon his experience in Will County, based upon the time sheets and other information that he learned from Mr. Simpson during the pendency of the litigation, that this was an informed decision and it was not an abuse of discretion. In sum, this comes down to the court's discretion. What Mr. Simpson described that he is intending to do is what we're trying to avoid with these attorney situations. So here we are litigating this issue a year, year and a half later, long after the litigation, the underlying case, is wrapped up. The court is in the best position to determine, having witnessed firsthand what the attorneys have done, what the case entails, and what work goes into the case. And for that reason, their decision should not be overturned in the absence of abuse of discretion. For those reasons, considering it cannot be said there was an abuse of discretion, including the fact that the case settled approximately seven to eight months after the fact, not immediately thereafter, the first ever settlement offer was obtained for Chelsea Hamm and the settlement offer for the estate of DeKovac doubled, we'd ask this court to affirm the decision of Judge Powers regarding the attorney's fees in this case. Any other questions? Okay. Thank you, Mr. You're calling it Ames? Ames. Ames, sorry. I gave you the wrong name before. Mr. Simpson? Well, I disagree with a lot of the facts that were stated, and I don't know whether it's because I was there and counsel wasn't or what, but I think this record doesn't support a lot of the things he said. But in that regard, in regard to Justice DeGage's question, the record is what it is as far as what Judge Powers had available to him. Well, here's what he claimed. That's true, but he claims that there was no trial. We know that. Judge Powers never said that he looked at the complaint in this case, and there's four status dates or five status dates that the white-side firm was at that nothing happened other than the case was continued for status. So his observation of what work they did on the case couldn't have been any more than that. And, in fact, some of them were probably greater orders. Well, let me ask you this. Have you got any case where the court ordered an attorney or a law firm, other than the one claiming the lien, to produce their record? Well, in Delapaz, the court never would have been able to compare how much work the new firm did versus the old firm and say that the first firm had done the bulk of the work unless they had all that information. So, I mean, that case doesn't say that you get to do that discovery, but it's just logically impossible to say, we're going to make a comparison about how much work was done, but we're not going to let both sides have that information. I know no case that bars that type of discovery in this situation. Frankly, I was appalled when Judge Pollard said to me, you can't have their file. Because I read Delapaz and I read Rhodes and I said, well, of course I have a right to this. This is the only way I can make these arguments. And then he said, all right, well, you're going to go to hearing without them. And so I brought my witnesses and I was ready to go. I want to just address a few things that I factually disagree with. I thought that Justice O'Brien's question was particularly poignant, though. Because basically what she said is, what did Judge Powers have to determine whether a contract fee should be awarded? And the answer is he had nothing. All he had was four status dates that they had been at. He had absolutely nothing more than that. And he never claimed that. They said, well, he said something, and I quote them, he says that he had seen the parties in action. I challenge this Court to look through that record from the transcript, from Judge Powers, and find something where he said he saw Whiteside and Goldberg in action. Because he hadn't. I mean, he said absolutely nothing about their performance. Because he didn't know anything about it. He hadn't presided over any settlement discussions. He hadn't presided over any arguments about depositions or written discovery. He had done nothing in this case with respect to that. And he's admitted as such. And that's why I asked him, how can you conclude that I can't pursue the contract fee if you know no facts? And his answer to me was that, you know, he doesn't want to argue with me, or, you know, I just should take it up to the appellate court. I mean, you know, they're trying to kind of be critical of me in some ways that I think are really unfair. They're suggesting that somehow the fact that the Dukovics discharged me was my fault. Well, that might not necessarily be true. I mean, it's very possible that they could have stolen this client in an unethical way. That's equally possible. I don't know the answer to that. But there's certainly no evidence in the record that I did anything improper by suggesting that we take some depositions in this case. If you get the contract fee, which is 33 percent, right, and assuming the successor law firm had a 33 percent contract with the client, then the successor law firm gets nothing. No, no. I disagree. I think that the answer to that is that somebody's always going to get the client in Maryland, and somebody's always going to get the contract fee. And it's just a question of whether it's the second firm that gets the contract fee and the first firm gets the client in Maryland, or vice versa. I never would have suggested to Judge Powers that they shouldn't be paid for their time. The argument I wanted to make is I should get the contract fee, and they should come in with their time sheets and show him all the work they did. You have to subtract that. They already have the money in their hands, don't they? It's in their claim fund account, yes, which I think I incorrectly stated is collecting interest. I think the Supreme Court collects that interest. The other thing he said was that somehow there's something improper about it. This is an important point. He said there's something improper about me subpoenaing Michael Goldberg, who was the partner at Whiteside and Goldberg, for this hearing. And he suggested I was trying to be unfair and difficult. Well, why did I subpoena Michael Goldberg? Because I didn't know who at their firm did any work because Judge Powers wouldn't give me any of the time sheets or any of their file. So you know what? The reason I'm subpoenaing Goldberg is not because I want to harass him. It's because I figure somebody at that firm must know what's going on, and if he's not going to give me their file, I've got to start somewhere. So, you know, that is the evidence of how important that evidence would be of having their file because then I could have skipped that stuff if what he said wasn't in fact true, which is that Mr. Whiteside did all the work on the case. I never knew that. And as far as Jeff Pavlich, I did subpoena him because they were arguing, well, they were disputing the fact of whether or not there was a $25,000 offer to the Dukovic State at the time I was discharged. They were claiming that I basically made that up. And so I wanted to subpoena Jeff Pavlich because I talked to him on the phone and he said, yes, I did make that offer, and I told you there was additional authority I could get, and I wanted him to support the fact that there was active discussions between me and the Dukovic, with the Dukovic State, as far as what that offer would be before I was discharged. So I think I was acting in good faith at that point, too, as well. Did you depose the Dukovics? I'm sorry? Did you depose the Dukovics? My own clients? Well, not anymore. Oh, yeah, no, I did not. Because, you know, there's cases... To me... I'm just wondering because you see these cases where the value is, it's sometimes, yeah, I can get you some more money, but some people even notice, okay, we can try to extort some money out of this trucking company, but there's also, even though we've lost our daughter, we want this done. You know, we want some finality, and we don't want this... You know, I... And that has value to some people. Yeah, you know, I mean, I think the Dukovics, when I last met with them, they were going through some tough financial times. They owned a liquor store that they were losing, and they were having some tough times. And I think that they really, at the heart, wanted to find out what had happened to their daughter and find out whether the truck driver... I mean, Pam Dukovic showed up at the traffic court trial against the truck driver in court and sat there every day because she was so mad about what he had done to kill her daughter. So, I mean, they were not unmotivated to try to get money from the truck driver, and they knew that there was a $3 million policy. But I think they were having financial problems. I'm not trying to second-guess the decision. I mean, I fully concede that. I might have taken these steps, and I might have then reached the same conclusion, which is we're probably not going to get more than $100,000 or whatever, and we need to, like, you know, we need to package this up and go home. I mean, it is what it is. But for somebody to tell me that I can't get the evidence to present how much work they did versus how much work I did, I think it's unfair. And so for all those reasons, I think in the Moaning case, which I think says I have a right to a hearing and I think due process says I have a right to a hearing, I ask that you grant our appeal and remand this to a good home so that I can get my day in court. Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will now stand in recess until 9 o'clock tomorrow morning. All rise. This court now stands in recess.